IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff,

vs.               Cr. No. 10-460 MCA

MICHAEL MONTOYA,

   Defendant.

## <u>ORDER</u>

This case is before the Court upon Defendant's *Motion to Suppress All Evidence Derived from an Unduly Suggestive Photo Array*. [Doc. 20]  The Court has considered the Motion, the United States' Response, [Doc. 44] Defendant's Reply, [Doc. 55] the United States' Supplement, [Doc. 58] Defendant's Response to the United States' Supplement, [Doc. 65] the United States' Memorandum of Law, [Doc. 78] the testimony of witnesses FBI Special Agent Mark Buie and Diane Dixon and the exhibits admitted into evidence at the hearings on this matter, and the arguments of counsel at the hearings on Defendant's Motion, and is otherwise fully advised.  For the following reasons, the Court **denies** Defendant's Motion.

## BACKGROUND

Defendant is charged with the April 23, 2009 attempted robbery of a Wells Fargo bank in Raton, New Mexico. Based upon the evidence presented at the hearing on Defendant's Motion and the exhibits admitted into evidence, the Court finds the following facts:

Diane Dixon, a Wells Fargo personal banker, was on duty when a man came into Wells Fargo's Raton bank shortly before noon on April 23, 2009. Ms. Dixon was sitting at her desk, which faced the lobby of the bank.  The front wall of Ms. Dixon's office is constructed of large

panes of glass, allowing Ms. Dixon to observe the lobby from her desk.  Ms. Dixon noticed the

man approach the teller line, then sit down in one of two chairs facing Ms. Dixon's office.  Ms.

Dixon finished a phone call and tidied her desk, which took no more than three minutes. Ms.

Dixon got up from her desk, approached the man, introduced herself, and invited the man into

her office.  The man followed her back into her office, where he sat in a chair on the opposite

side of her desk.  The man was seated about three to four feet from her, facing her across her

desk.  Ms. Dixon's office was well lit. The man reached into a satchel or laptop bag and

withdrew a letter, which he pushed across the desk toward Ms. Dixon. She picked up the letter

and leaned back in her chair to read the letter, thinking it might concern opening a certificate of

deposit.  The letter appeared to be computer generated and was printed in bold black type, except

for certain words that were  printed in red.  The letter began with a direction to read it very

carefully. By the time she had read part way through the letter, Ms. Dixon realized that the man

was a robber, not a customer. The letter instructed Ms. Dixon to do as the man told her to do, and

warned that if she did not follow his instructions, the man  would detonate a bomb that would

make everyone in the bank "look like Swiss cheese." The note also stated that the man was

armed with a gun.   Ms. Dixon asked the man what he wanted her to do. The man told her to take

him to the vault.  She informed him that she could not let him into the vault because it required

two employees to open the vault.  The man hesitated, leaving Ms. Dixon with the impression that

he was nervous, then instructed her to get a hold of somebody.  She then informed him that the

other person required to open the vault was not available.  She offered to call a bank officer/

manager named "Margaret."  "Margaret" was in fact a duress signal that would have alerted

other bank employees that Ms. Dixon was in need of assistance. Defendant told Ms. Dixon not to

call anyone else into her office.   Ms. Dixon's office was equipped with a silent alarm, but she

did not trigger it because she was afraid that the man would notice if she attempted to use it. The man appeared to Ms. Dixon to be very nervous.  She thought to herself  that he appeared not to know what he was doing.  He appeared to Ms. Dixon to have given up on going into the vault. She asked him if there was anything else she could do, such as taking him to the teller line. The man declined and asked her to wait.  At this point a bank customer with an appointment with Ms. Dixon came into the bank and sat down in a chair in the waiting area located just outside of her office.   After observing the man sitting in silence for about thirty seconds in her office, appearing to stare at Ms. Dixon's desk, she pushed the letter back to him, telling him that she had to wait on the customer with an appointment.  She suggested that the man take back his letter and leave.  The man took back the letter, stood up,  said "Thank you," or "Sorry" and walked out of the bank.  A time-stamped security video establishes that the man was in the bank for about eight minutes,  approximately three of which were spent sitting in a chair waiting for Ms. Dixon.   The man was in Ms. Dixon's office for four minutes and fifty-three seconds. Except for the time spent reading the letter, she looked directly at the man's face while he was in her office. During the encounter Ms. Dixon was nervous, but remained in control of her emotions.

Ms. Dixon wrote out  two accounts of the attempted robbery  shortly after the attempted robbery. In one account she described the suspect as "Young male, 20-24 yrs, 5'10", slender build, dark complexion (hispanic or from Indian). . . No facial hair, no jewelry, no tatoos." Gov. Ex. 2. In the other, she marked boxes on a form indicating that the subject was male, of Hispanic/Latino or Unknown race, 5'10" in height, slender build, Dark complexion, oval-shaped face, medium sized brown eyes, no facial hair and short black hair. Gov. Ex. 13.  Two FBI Special Agents assigned to the FBI's Santa Fe office, Arlen Scholl and Mark Buie, responded to the attempted robbery, arriving in Raton sometime in the afternoon April 23, 2009.  Ms. Dixon

3

was interviewed by  Special Agent Scholl.  Agent Scholl recorded the following description

given by her: male, Hispanic, or Native American, dark complexion, early 20s, approximately 5'

10" in height, slender build, short brown or black hair, dark eyes, no facial hair, smooth skin, no

earrings or tattoos, and a prominent nose.

By June of 2009, Agent Scholl had closed the case due to a lack of suspects. However, in

early June 2009, Colorado law enforcement officers arrested James McBride on suspicion of

committing a bank robbery  in Cortez, Colorado. During debriefing by the FBI, McBride

implicated Defendant in the attempted bank robbery in Raton. The FBI's investigation into the

attempted bank robbery in Raton was reopened.

As part of the investigation into the Raton attempted bank robbery, an Albuquerque FBI

analyst put together a six-photograph photo array.  The photo array consists of a manilla folder

with two horizontal rows of three rectangular cut out windows. Behind each window is a

photograph of a relatively young male of apparent Hispanic ethnicity, each with short dark hair

and no facial hair.   The backgrounds of the six photos alternate between green and blue. The

images in photos Numbers 1 and 3 have been clipped out of their original backgrounds like

paper dolls and placed against green backgrounds.  Defendant's photo is Number 5, the middle

photo in the bottom row.  Defendant appears against a green background. The following

admonition is printed on the back of the folder in English and Spanish:

> In a moment I am going to show you a group of photographs.  This group of
> photographs may or may not contain a picture of the person who committed the
> crime now being investigated.  Keep in mind that hair styles, beards, and
> moustaches may be easily changed.  Also, photographs may not always depict the
> true complexion of a person--it may be lighter or darker than shown in the photo.
> Pay no attention to any markings or numbers that may appear on the photos or
> any other differences in the type or style of the photographs.  When you have
> looked at all the photos, tell me whether or not you see the person who committed
> the crime.  Do not tell other witnesses that you have or have not identified

anyone.

Below the admonition are  signature lines for the witness and for the agent showing the array.

On August 19, 2009, Special Agents Scholl and Buie traveled to Raton to show Ms. Dixon the photo array.   The Agents met with Ms. Dixon in an office at the Wells Fargo bank where the attempted robbery took place.  The two agents and Ms. Dixon were the only persons present in the room.  Agent Scholl  read the admonition on the back of the photo array folder  to her and then showed her the photo array.  She did not know whether the photo array would include a suspect.  She took a few minutes to examine the array.  The agents did not  pressure her to make an identification or call her attention to Defendant's photo.  She selected Number 5, Defendant's photo.  On the back side of the array folder,  Ms. Dixon wrote "# 3 is the most." As she was writing, it occurred to her that Number 3 was not the photo she had selected. She turned the array over, and realized that she had identified Number 5, not Number 3, as the suspect.  She scratched out "3",  wrote "5" in its place, initialed the correction, and completed the sentence by adding "similar to the suspect." Her name and the date are written on the signature line for the witness under the printed admonition on the back of the photo array folder.

**DISCUSSION**

The governing legal standards are well established:

When the constitutionality of a photo array is challenged, the due process clause requires a two-pronged inquiry:  first, the court must determine whether the photo array was impermissibly suggestive, and [second] if it is found to be so, then the court must decide whether the identifications were nevertheless reliable in view of the totality of the circumstances.  These two prongs must be analyzed separately, and it is only necessary to reach the second prong if the court first determines that the array was impermissibly suggestive. . . .
. . . .
   Courts use a number of factors to [to determine the first prong], including the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves. . . .a photo array with as few as six pictures is not

per se unconstitutional. . . .

*United States v. Sanchez*,  24 F.3d 1259, 1261-62 (10th Cir. 1994) (citations omitted).

As noted in *Sanchez*, a photo array with as few as six pictures, as in this case, is not per

se unconstitutional.  Here, the subjects of the photographs are all arguably Hispanic males of

roughly similar build, age, hairstyles, are all clean shaven and appearing with varying shades of

medium to dark colored skin tone.  Although the backgrounds are of two different colors, they

alternate in a regular, green, blue, green, blue, green, blue pattern.  However, the one feature of

the array that causes the Court particular concern is the Defendant's skin tone, which appears

considerably and noticeably darker than that of the subjects in the other photos. The eye of a

viewer  is immediately drawn to Defendant's photo, particularly so if the viewer is looking for a

suspect described as dark-complected or "from India[]."  Considering that a dark complexion

was an important component of the suspect's appearance as described by Ms. Dixon in each of

her statements, the Court finds that this aspect of the photo array  was unnecessarily suggestive.

However, that the array itself was unnecessarily suggestive does not mean that Ms.

Dixon's pre-trial  identification of Defendant must be suppressed.  "The 'central question is

whether under the totality of circumstances, the identification was reliable.'"  *Grubbs v.*

*Hannigan*,  982 F.2d 1483, 1490 (10th Cir. 1993)  (quoting *United States v. Thurston*, 771 F.2d

449, 453 (10th Cir. 1985)) (internal quotation marks omitted).  Although the photo array itself

was unnecessarily suggestive, the manner in which it was presented to Ms. Dixon was not.  The

admonition provided to Ms. Dixon explained that the suspect's picture may or may not be in the

array.  The Court has found that prior to examining the array she did not know whether the

suspect's picture would be included in the array. And the Court has found that the FBI Agents

who were present did not  pressure her to make an identification or direct her attention to

6

Defendant's photo.

Furthermore, the balance of the factors identified in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972) as applied to the facts of this case supports a finding that Ms. Dixon's identification was sufficiently reliable to satisfy the requirements of due process, notwithstanding the suggestiveness of the photo array.  First, Ms. Dixon had the opportunity to observe the suspect over an approximately five minute period under excellent lighting conditions while she was seated a very few feet from the suspect.  Second, she testified that she paid close attention to the suspect's appearance because of training and because she knew that she would be expected to identify the suspect.  Third, her descriptions of  the suspect are internally consistent and generally consistent with Defendant's actual appearance, as observed by the Court.[1]  Fourth, she testified that at the time she selected Defendant's photo she was "ninety-nine" or "ninety-five" percent certain that the person whose photo she selected was the suspect.  Lastly, the time between the attempted robbery and the photo identification  was  about four months, a period that is not so long as to call into question the reliability of  Ms. Dixon's identification.  The balance of factors leads the Court to the conclusion that under the totality of the circumstances Ms. Dixon's pre-trial identification of Defendant was sufficiently reliable to satisfy due process. Defendant's motion will be denied to the extent it seeks to suppress Ms. Dixon's pretrial identification of Defendant.

Defendant has also moved to suppress any in-court identification by Ms. Dixon at his

---

[1]In his recent appearances before the Court Defendant does not appear especially dark-complected or (East) Indian, but certainly his appearance is consistent with the description "Hispanic." Although Ms. Dixon underestimated Plaintiff's age, Defendant is somewhat young looking for his age. Any mild discrepancies between Defendant's actual characteristics and those reported by Ms. Dixon do not undercut the Court's impression of Ms. Dixon as an observant, clear-headed, and credible witness.

trial.  [Doc. 20 at 2] Because the Court has determined that Ms. Dixon's pre-trial identification of  Defendant's photo was sufficiently reliable under the totality of  the circumstances to satisfy due process, Defendant's motion will be denied to the extent it seeks to prevent  Ms. Dixon from identifying Defendant in court at his trial.  *See United States v. Wiseman*, 172 F.3d 1196, 1211 (10th Cir. 1999).

WHEREFORE,

IT IS HEREBY ORDERED that  Defendant's *Motion to Suppress All Evidence Derived from an Unduly Suggestive Photo Array* [Doc. 20] is **DENIED.**

**SO ORDERED this 24th day of February, 2011.**

_____

M. CHRISTINA ARMIJO
UNITED STATES DISTRICT JUDGE